IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                              Plaintiff,

v.

LEE ANTON JACKSON,

                              Defendant.

REPORT AND
RECOMMENDATION

08-cr-69-bbc
_____

## REPORT

The grand jury has charged defendant Lee Anton Jackson with being a felon in possession of a firearm based on an investigation conducted by the Madison Police Department on March 9, 2008. Police recovered the handgun from Jackson's computer bag after obtaining consent to search from Jackson's mother. Jackson subsequently made a self-inculpatory statement while ensconced in a squad car following his arrest. Jackson has moved to quash the consent search and to suppress his statement. For the reasons stated below, I am recommending that court deny both motions. That said, the motion to suppress Jackson's statement presents a closer call than might be expected because of the manner in which the officers handled their investigation.

On June 18, 2008, this court held an evidentiary hearing. Having heard and seen the witnesses testify, having made credibility determinations, and having viewed the relevant exhibits, I find the following facts:

## FACTS

In early 2008, the Madison Police Department (MPD) suspected that a strip mall at 1900 South Park Street was a locus of fencing activity generated by a rash of recent burglaries. One of their suspects was Lee Anton Jackson, who frequented the strip mall for a variety of reasons, some of which the police believed were related to fencing. Officers had interacted with Jackson and his mother, DaFondeau Eaton, prior to and during this period; it had gotten to the

point that Eaton had complained about MPD officers to other city officials. Officer David Dexheimer was one of Jackson and Eaton's prime antagonists.

As part of its investigation, MPD regularly assigned officers to conduct surveillance at the strip mall. During the early evening of March 9, 2008, Officer Dexheimer was parked behind the strip mall on Beld Street (with no view of the mall's parking lot), while fellow officer Steven Chvala watched from the other side of Park Street. Around 7:00 pm, a silver Monte Carlo registered to Jackson drove into the parking lot. Officer Dexheimer advised Officer Chvala via radio that Jackson was a suspect in the investigation. Officer Dexheimer knew that Jackson had prior felony convictions for crimes such as burglary.

Officer Chvala watched Jackson retrieve something from the trunk of his car and give it to another man who left. Later still, around 8:15 pm, a woman drove her Chevy Nova into the parking lot. After receiving the car's license number from Officer Chvala, Officer Dexheimer reported that the car belonged to DaFondeau Eaton, and that the person described by Officer Chvala matched Eaton. Officer Dexheimer reported that Eaton did not possess a valid driver's license, and therefore was operating after revocation (OAR).

Officer Chvala watched Jackson and Eaton enter the Monte Carlo. Jackson retrieved a black attaché/computer case and gave it to Eaton. Both exited the car and walked to Eaton's Nova. Eaton drove south on Park Street and Jackson entered a strip mall store.

Officer Dexheimer pulled out and followed Eaton, intending to stop her for the OAR violation and to see if he could learn the contents of the attaché case. Officer Dexheimer activated his roof lights and Eaton pulled into the Burger King parking lot off of Badger Road. Officer Dexheimer explained the reason for the stop, then asked Eaton about her contact with her son at the strip mall just moments before. Eaton told Officer Dexheimer that her son had

lent her his computer so that she could download and view new pictures of her grandchild. Officer Dexheimer asked Eaton if he could look at the bag and the computer. Dexheimer did not tell Eaton that she could refuse consent to search. Although Jackson had adamantly insisted that his mother not allow anyone actually to open his computer or access its files, Eaton did not convey any such instructions to Officer Dexheimer. She simply agreed to his request. Eaton did not limit her consent to search the bag in any fashion. She handed him the computer bag from the passenger seat of her car. Officer Dexheimer removed the laptop from the case but was unable to unlatch it until Eaton assisted him while she remained seated in her car. Officer Dexheimer looked at the computer then put it back into the attaché case.

Officer Dexheimer then unzipped an exterior pocket of the attaché case. In the pocket he saw a handgun. Eaton also saw it and was genuinely shocked, proclaiming that she had had no idea that the gun had been in there. Officer Dexheimer radioed Officer Chvala to report discovery of the gun in Jackson's bag.

Officer Chvala received Officer Dexheimer's report of the gun about the time that Jackson drove from the strip mall. Officer Chvala followed Jackson for several blocks without stopping him, waiting for other squad cars to arrive and take position for a high risk felony stop. At least six squad cars participated. The police stopped Jackson's car, ordered him out at gunpoint and placed him in the back seat of Officer Kipp Hartman's squad car. They did not handcuff Jackson because one of his wrists was in a cast. Jackson, however, was not free to go.

Officer Chvala decided to question Jackson one-on-one, so Officer Hartman stepped out of his own squad car. Officer Chvala made no attempt to *Mirandize* Jackson before questioning him about his activities that night and the recovery of a firearm from the computer bag that

3

Jackson had given to his mother.[1]  Jackson answered some of the questions, but upon being confronted with evidence of a handgun, announced that he would answer no further questions without assistance of an attorney.[2]

What got said next is hotly disputed.  Jackson testified that Officer Chvala stopped asking him questions but then said to Officer Hartman words to the effect of "that's okay then, we'll just charge his mother with the gun."  Officer Chvala denies making any such statement to anyone.  Officer Hartman denies that any such statement was made to him; he also testified that he did not recall the statement being made to anyone else, although he knows that Officer Chvala spoke to other officers near Hartman's squad car.

Officer Hartman re-entered his squad car and prepared to take booking information from Jackson.  Within about a minute, Jackson asked Officer Hartman if Jackson could say something.  Officer Hartman replied that he could.  Jackson stated that "there's nothing in that bag that belonged to my mama."

At the time, Jackson was 37 years old.  He had a series of criminal convictions in the mid-1990's, followed by his pursuit of higher education resulting in several technical college diplomas in automotive skills, carpentry, small business training, computer literacy, and recording technology.

---

[1] Officer Chvala also violated Wis. Stat. Sect. 968.073 which requires state actors to record custodial interrogations of felony suspects.

[2] "Then I pointblank just asked him if there was a possibility that he was aware there was a gun in the bag, to which at that point he stated something to the fact that he wanted to talk to an attorney and did not wish to talk with me any further."  Tr., Dkt. 20, at 27.

**ANALYSIS**

**I. The Consent Search**

Jackson contends that on these facts, Eaton did not have the actual authority to consent to the search of his computer bag, she did not have the apparent authority to consent to the search of the computer bag and that whatever consent she might have given did not extend to the side pockets of the computer bag.

A warrantless search does not violate the Fourth Amendment if a person possessing, or reasonably believed to possess, authority over the item to be searched voluntarily consents to the search. The rationale for this rule is that when a person allows someone else to exercise actual or apparent authority over his property, the property owner has assumed the risk that the other person might permit access to others, including the police. The existence of actual or apparent authority depends on the totality of circumstances. *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008). Actual authority over the item to be searched provides actual authority to allow its search; apparent authority arises when the consentor lacks actual authority but the facts available to the inquiring officer at the moment warrant a person of reasonable caution in the belief that the person does have authority over the item. *United States v. Goins*, 437 F.3d 644, 649 (7th Cir. 2006).

A consent search is manifestly reasonable as long as it remains within the scope of the consent provided; the scope of consent is limited by the breadth of actual consent, a question to be determined from the totality of circumstances. *Michael C. V. Gresbach*, 526 F.3d 1008, 1015 (7th Cir. 2008); *see also United States v. Long*, 425 F.3d 482, 486 (7th Cir. 2005). The operative question is "what would the typical reasonable person have understood the scope of consent to be by the change between the officer and the [consentor]?" *United States v. Breit*, 429

5

F.3d 725, 729 (7th Cir. 2005), quoting *United States v. Torres*, 32 F.3d 225, 230-31 (7th Cir. 1994). Finally, it is the government's burden to prove by a preponderance of the evidence that the consent obtained was voluntary, namely not the product of duress or coercion, express or implied. *United States v. Bernitt*, 392 F.3d 873, 877 (7th Cir. 2004).

DaFondeau Eaton had actual authority over her son's computer and the bag in which it was stored. Jackson had provided the computer and its storage bag to Eaton so that she could use the computer to look at photographic images of her grandchild (Jackson's niece). Obviously, she would be opening the bag to remove and use the computer. Logically, she also would have authority to open all of the side pockets, which might contain a power cord, disks and other peripherals.

It may be true that Jackson expressly directed his mother not to let anyone else use his computer for any purpose, but it was up to Eaton to implement this direction. The police cannot be bound by a restriction imposed by Jackson about which they did not know and could not have known. All Officer Dexheimer knew was that Eaton was in physical possession of the computer and the storage bag, she had Jackson's permission to use the computer, and she consented, without limitation, to his inspection of the computer and the bag. Officer Dexheimer suspected that the computer was stolen and Eaton knew that it wasn't, so it is not surprising that Eaton would allow Officer Dexheimer to look at the computer in order to prove him wrong, notwithstanding her son's instructions.[3] For the same reason, Eaton had no reason to limit her consent to the computer as opposed to the bag's pockets. To the best of her knowledge,

---

[3] One also could infer that Eaton interpreted her son's instructions not to let anyone touch his computer as an instruction not to let anyone use it and mess with its contents as opposed to an instruction to prevent anyone from literally handling the computer.

everything was on the up-and-up, which meant that she could score some points against Officer Dexheimer in their simmering feud. Whatever her thought process, she had the authority to consent and she did consent to a search of the object her son had given her and she did not limit that consent in any fashion. Therefore, it was reasonable for Officer Dexheimer to open the pocket in which he found the firearm. This court should deny the motion to suppress this evidence.

## II. Jackson's Post Arrest Statement

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), once the police took Jackson into custody, he had the right to remain silent and the police were required to honor this decision. If the police subsequently were to obtain a statement from Jackson by questioning or its functional equivalent, then the admissibility of that statement would depend on whether the police had "scrupulously honored" Jackson's right to cut off questioning . *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). The operative question is whether Officer Chvala provoked Jackson's post-arrest statement with the functional equivalent of questioning or whether it was a volunteered statement. Volunteered statements are not the fruit of interrogation and therefore not subject to the constraints of *Miranda*. *See United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007). On the other hand, the police cannot evade the requirements of *Miranda* by provoking a statement with words that they objectively should know are reasonably likely to elicit an incriminating response from a suspect. A statement is not volunteered if it is the result of compelling influences or psychological ploys by the police. *Id.*, *citing Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980).

Here, the crux of the analysis is a determination of fact: did Officer Chvala threaten Jackson's mother with arrest or not? If he made this threat, then he violated *Miranda*, *Mosley,* and *Innis* with one fell remark. If he did not, then the only explanation for Jackson's statement is that he volunteered it in order to remove any possible suspicion from his mother.

The sworn, consistent, cross-examined testimony of two MPD officers ought to be enough to prove such a fact. Regrettably, it's not so clear cut in this case: Officer Chvala's intentional violation of Jackson's *Miranda* rights, state statute and department policy compromises his credibility. Ordinarily unnecessary questions have to be asked: if a police officer is willing to seek inculpatory admissions from an arrested suspect in the back of a squad car without *Mirandizing* him or recording the interrogation, then how much of a stretch is it for that officer to aim a parting shot at the suspect by threatening gratuitously to arrest the defendant's mother? How much more of a stretch is it for that officer to deny this conduct under oath at a suppression hearing?

At this time, the answer to the first question is "not much," while the answer to the second question is "huge." An officer who admits stolidly using improper methods to interrogate an arrestee logically must be viewed as capable of using other improper means, so it may not be much of a leap to assume that Officer Chvala threatened Jackson's mother in order to provoke a response or to get inside Jackson's head because Jackson refused to talk.

But I would not expect Officer Chvala to lie about this under oath. The cost/benefit ratio would appear to be skewed completely against perjury. First, Officer Chvala already admitted violating Jackson's *Miranda* rights once; why would he be shy about admitting an arguable

follow-up violation?[4]  Second, it's one thing to rough up the Fifth Amendment, which only leads to evidence exclusion, it's quite another to lie under oath, which could lead to personal disciplinary proceedings and criminal prosecution.  The stakes are too high to risk being caught in a sworn false statement.  Third, Jackson's statement to Officer Hartman isn't that important to this prosecution.  Given the other evidence available to the government, Jackson's back-handed admission fades in importance; certainly, it is not such a critical component in such a major prosecution that it would tempt an MPD officer to ensure its admissibility through perjured testimony.

Fourth, and related to the third point, Officer Hartman corroborates that Officer Chvala never made any such statement to him and he does not recall hearing him say it to anyone else. Unless the MPD has taken a page from the Ramparts CRASH Unit playbook, it is difficult to imagine that two MPD patrol officers would conspire to cover up an improper on-scene interrogation by perjuring themselves at a federal suppression hearing where the evidence in dispute is inconsequential.

Jackson's testimony on this critical point contradicts the officers. I do not find that Jackson lied to the court.  Having heard and seen all three witnesses testify, the most accurate conclusion I can reach is that the evidence on this point is so muddled that I cannot find that it is more likely than not that Officer Chvala made any statement about Jackson's mother. Therefore, I do not find it as a fact. Jackson has not proved the predicate fact on which his motion to suppress is founded.  *See United States v. Utecht*, 238 F.3d 882, 887 (7th Cir.

---

[4] "Arguable" because the government could have contended–albeit unsuccessfully–that Officer Chvala's parting shot was not improper and that any resulting statement from Jackson should not be suppressed.  *See, e.g., United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006).

2001)(when requesting suppression, defendant first must allege facts demonstrating the need for a hearing then at hearing must produce evidence that he is entitled to the relief sought).

In light of this, Jackson's statement must be deemed volunteered.  Since a statement volunteered during booking is not subject to the constraints of *Miranda*, *see United States v. Hendrix*, 509 F.3d at 374–and I conclude that Officer Hartman was asking neutral booking questions without a nefarious agenda–it was not improper for Officer Hartman to acquiesce to Jackson's request to make a statement exculpating his mother and implicitly incriminating himself.  Therefore, Jackson's statement was voluntary and he is not entitled to its suppression at trial.

Looking at the bigger picture, the government is poised at the edge of a slippery slope. The evidence presented at the suppression hearing establishes that MPD officers are willing to undertake the substantive custodial interrogation of a suspect in the back of a squad car without making any attempt to *Mirandize* him.  Hopefully this case presents an aberration.  If, however, the new normal of street-level law enforcement in Madison involves playing fast and loose with the Constitution, then the U.S. Attorney's Office will need a tighter mesh for its screening apparatus because these tactics will not pass muster in federal court.[5]

---

[5] We already have been down this path with some of the drug task forces in Northern Wisconsin. *See United States v. Mykytiuk*, 402 F.3d 773, 777-78 (7th Cir. 2005).

RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B) and for the reasons stated above, I recommend that this court deny in all respects defendant Lee Jackson's motion to suppress physical evidence and to suppress his post-arrest statement.

Entered this 3rd day of September, 2008.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

September 3, 2008

Peter Jarosz
Assistant United States Attorney
660 West Washington Avenue
Madison, WI 53703

Joseph L. Sommers
Attorney at Law
P.O. Box 244
Oregon, WI 53575-0244

  Re: United States v. Lee Anton Jackson
    Case No. 08-cr-69-bbc

Dear Counsel:

  The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

  The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

  In accordance with the provisions set forth in the newly-updated memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before September 15, 2008, by filing a memorandum with the court with a copy to opposing counsel.

  If no memorandum is received by September 15, 2008, the court will proceed to consider the magistrate judge's Report and Recommendation.

          Sincerely,

          /s/

                                               Connie A. Korth
                                               Secretary to Magistrate Judge Crocker

Enclosures

cc:     Honorable Barbara B. Crabb, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth

with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).